IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT HUNTINGTON

JOHN DOE,

      **Plaintiff,**

v.                                                                    Civil Action No. <u>3:25-cv-00743</u>

MARSHALL UNIVERSITY
BOARD OF GOVERNORS AND
KELLY AMBROSE in her
individual and official capacities.

      **Defendant.**

## COMPLAINT

John Doe[1], by and through his counsel, Abraham J. Saad, Hoyt Glazer, and Glazer Saad Anderson L.C. files this Complaint against the Marshall University Board of Governors ("Marshall") and Kelly Ambrose, the Title IX investigator, for gender-based discrimination in violation of 20 U.S.C. § 1681 (commonly known as Title IX), violation of 42 U.S.C. § 1983Violations of the Human Rights Act, Breach of Contract, and Intentional Infliction of Emotional Distress. Plaintiff Doe, a male, was a Marshall student from 2019 to 2023 and then proceeded to a graduate program. He received his undergraduate degree from Marshall University, but in the spring of 2024 the University expelled him for violating Title IX based upon the allegations of a female student. Plaintiff brings this civil action for the claims set forth below and requests this Court reverse the findings of the Title IX panel based upon the extreme gender bias Plaintiff faced and the selective enforcement and erroneous outcome theories as set forth in *Yusuf v. Vassar College*, 35 F.3d 709 (2nd Cir. 1993); See also, *Doe v. Coastal Carolina Univ.*, 552 F.

---

[1] Plaintiff files with John Doe and other witnesses through similar protected names to preserve anonymity and protect his and their identities.

1

Supp. 3d 173 (2023).

## PARTIES

1.  Plaintiff, John Doe, is a male, former Marshall University graduate student, and resides in Putnam County, West Virginia.

2.  Defendant Marshall University Board of Governors ("Marshall") is the governing body that controls, supervises, and/or manages the affairs of the Marshall University, a West Virginia institution of higher education, and is located in Huntington, West Virginia.

3.  Defendant Kelly Ambrose is sued in her individual capacity for all claims for relief made against her, exceptive for the request for prospective declaratory relief, in which case she is sued in her official capacity. Upon information and belief, Kelly Ambrose resides in the State of West Virginia.

## INTRODUCTION AND FACTUAL BACKGROUND

4.  After facing multiple lawsuits based upon its Title IX process, Marshall University overhauled its Title IX process. Marshall feared the public backlash after the school failed to expel a student after a Title IX investigation.

5.  USA Today "investigated" this matter and published a national article concerning this case: Alicia Gonzales v. Marshall University, 3:18-cv-00235 (Dismissed in S.D.W.Va. on July 30, 2019).

6.  USA Today published this article on or about November 16, 2022 How a top university failed survivors during their Title IX cases (usatoday.com).

2

7. The article outlined the following: USA TODAY's investigation found that Marshall holds few students accountable in Title IX cases, and victims remain critical of the way those cases are handled.

8. According to the article, data provided by Marshall from January 1, 2018 through December 31, 2020, showed the school received few Title IX reports. It investigated most of them but finds few students responsible. Only 18% of formal investigations resulted in findings of responsibility – one of the lowest rates of schools examined by USA TODAY. According to USA Today, their conclusion was that "this suggests a high burden for complainants to prove they were assaulted, stalked and harassed, and may also indicate that a large number of complainants are dropping out of the process."

9. The article and other publications indicated that "of the 10 students found responsible during that time frame, eight avoided expulsion or suspension, instead being ordered to attend Title IX training and counseling."

10. University President Brad D. Smith issued a campus-wide statement addressing the USA TODAY investigation and detailing steps the school has taken to strengthen its Title IX procedures. "Over the past several months, we have been working on restructuring the Title IX Office. This restructure included moving the Title IX accountability to the Office of General Counsel. In addition, a new Title IX Coordinator will be named," Smith wrote in an email to students, faculty and staff.

11. On November 18, 2022, USA Today follow up on its article documenting the steps and statements of Marshall and new president, Brad Smith. Marshall seeks new Title IX coordinator after USA TODAY investigation.

12. On November 21, 2022, another female filed a Civil Complaint in the United States District Court for the Southern District of West Virginia Case No. 3:22-cv-00532 against Marshall University in *Roe v. Marshall University Board of Governors*, in a lawsuit that cited Brad Smith's public statements: "Let me assure you that Marshall University has no higher calling than to keep its students, faculty and staff safe."

13. On November 22, 2022, Marshall University students protested supporting the public outcry that women were not safe or protected at Marshall University. Marshall University Students Protest Title IX Practices (insidehighered.com).

14. Marshall University's student newspaper, the Parthenon, covered the student protests and Title IX negative press regularly. A Marshall University Student is in Prison for Rape, His Victims Reveal how the School Failed them - The Parthenon (marshallparthenon.com)

15. On or about November 30, 2022, Marshall creates a Title IX Task Force after campus protests New Title IX Task Force at Marshall University gets student feedback | WOWK 13 News (wowktv.com)

16. In February 2023, Marshall University named Jessica H. Donahue Rhodes, Esq. Title IX Coordinator after her serving as the Interim Title IX Coordinator for several months.

17. During that same month, in February 17, 2023, John Doe met with the Title IX office and Jessica Rhodes over comments and rumors alleging he engaged in sexual inappropriate conduct toward student(s).

18. On or about March 6, 2023, three separate students – a male, a female, and a transitioning individual, filed unrelated claims against John Doe.

19. All three students conferred with each other to file allegations at the same time even though the alleged events stemmed from the previous year or two.

20. Marshall University and the Title IX office continued to receive heavy media scrutiny and coverage in the Winter and Spring of 2023. Marshall's Title IX office looks forward after controversy | Education | wvgazettemail.com

21. In 2022 and 2023, Ms. Rhodes served as Title IX Coordinator and Investigator in several matters where the neutrality of her role was questioned.

22. Three separate Marshall students – one female, one met together and discussed John Doe.

23. Three separate Marshall students filed Title IX Complaints against John Doe in February or March of 2023.

24. Jessica Rhodes typically investigated claims herself, but she assigned an investigator for the present matter.  As Title IX Coordinator, Ms. Rhodes and Marshall appointed as Investigator, Defendant Kelly Ambrose, a current or former military officer.

25. Defendant Ambrose investigated the three unrelated matters against Plaintiff.

26. The same three-faculty panel heard the three unrelated claims against Plaintiff.

27. In every case, Defendant Ambrose relied on the separate allegations and an unsubstantiated claim four years prior claiming that the event was likely to have happened. Each claim on its own lacked sufficient evidence or facts to establish substantiation against Plaintiff.

28. Marshall University provides each student – pursuant to Title IX – with a harassment policy, code of conduct, and a contract or agreement on how students are to conduct

themselves and the rights students are afforded whether a victim or the accused. These are contained within Marshall's Code of Conduct: Rights, Rules, & Responsibilities."

29. This policy provides a contractual relationship between Marshall and its students.

30. Following the 2021 and 2022 outcries against Marshall University's Title IX department, Marshall began heavily scrutinizing any and all males accused of sexual misconduct and overwhelmingly found fault against them.

31. Following the 2022 outcry and lawsuits, Marshall began a discriminatory pattern and practice against males accused of sexual misconduct.

32. Title IX Department has a history and pattern of restricting questions that an accused (or accused's representative) can ask claiming the questions violate the Rape Shield Laws or that they violate the privacy of the alleged victim.

33. In many instances, the Rape Shield Law and privacy do not apply to the restricted questions as the questions come directly from the Title IX investigators "Findings of Fact."

34. In most, if not all, cases, the Title IX investigator or office presents a Title IX report having already made a conclusion or finding of fact before the hearing panel even sees or reviews it. This presents a bias and skewed report to the panel.

35. During the hearings involving John Doe, Defendant Ambrose regularly worked to discredit Plaintiff's factual and first-hand witnesses and "bias" simply because they know him.  In fact, one witness repeatedly tried to reach out to Ambrose to let her know she heard the alleged victim make statements contrary to what she informed the Investigator. The Investigator – without factual support – deemed the statement not credible.

36. Defendant Ambrose openly questioned every aspect of John Doe's credibility in front of the hearing panel.

37. At the same time, Defendant Ambrose openly excused and minimized the blatantly inconsistencies and contradictions of every alleged victim to the detriment of John Doe.

**Allegation #1**

38. In 2022, Plaintiff was the target of multiple, coordinated false Title IX complaints.

39. Plaintiff John Doe had consensual intercourse with the alleged victim, Jane Roe, in November of 2022 – hereafter referenced as Alleged Victim #1 or Jane Roe.

40. Alleged Victim #1, Jane Roe, was dating another male Marshall student at the time of her consensual intimacy with Plaintiff.

41. The Alleged Victim #1, Jane Roe, had shared intimate moments with Plaintiff prior to the evening where she falsely claimed Plaintiff had intercourse with her without her consent.

42. Jane Roe openly discussed Plaintiff and her infatuation with him.

43. The alleged victim, Jane Roe, testified that she *might have given* consent to Plaintiff (emphasis added).

44. Two female witnesses testified under oath that Jane Roe expressly told them each that she liked Plaintiff and that she was going to "f*ck him."

45. One of the female witnesses testified that she tried to reach out to the Title IX Investigator, Kelly Ambrose, on multiple occasions but Ambrose failed to reach out to her.

46. These same two female witnesses testified at the Title IX hearing in support of Plaintiff based upon first-hand information.

47. Defendant Ambrose told the Title IX Panel that she did not find the two female witnesses credible because they were "friends" with Plaintiff.

48. Both female witnesses testified that they would report Plaintiff if they knew or thought he assaulted a female without her consent, but they both knew – through Alleged Victim #1's words – that she stated she wanted to engage in sexual contact with Plaintiff and that she intended to do so.

49. Alleged Victim #1 Jane Roe told her boyfriend that she had sexual contact with Plaintiff.

50. After Alleged Victim #1 Jane Roe spoke with her boyfriend, she then claimed that Plaintiff engaged in sexual contact without her consent.

51. On repeated occasions throughout the hearing and in her pre-recorded closing statement, Jane Roe lamented that Plaintiff told others he engaged in a sexual relationship with her but had not been interested in a relationship.

52. Jane Roe's ex-boyfriend and several of his acquaintances showed up to Plaintiff's apartment attempting to break in and threatening to physically harm Plaintiff. They encouraged Plaintiff to self-harm himself. The incident was captured on video and presented to the Title IX investigator.

53. Plaintiff filed a Title IX Complaint against the boyfriend and his acquaintances. This was the only complaint handled by a different Title IX panel of Marshall faculty. Marshall maintained the same panel against Plaintiff for the three allegations against him, but fielded a separate, independent panel to hear the threats against him.

54. While Plaintiff's claim against those individuals was substantiated, the students were not expelled or suspended from Marshall University.

8

55. During the investigation into Alleged Victim #1's allegations, Defendant Ambrose interviewed an individual, who claims to have had interactions with Plaintiff four years prior. This individual did not testify at any Title IX hearing. The individual allegedly older than Plaintiff by several years while Plaintiff was a freshman at Marshall. Yet this older male hanging out with high school students made claims that Defendant Ambrose adopted as "Findings of Facts" although he made several contradictory claims.

56. During the investigation, Defendant Ambrose received an anonymous letter claiming to be part of the alleged incident four years prior.

57. Despite being given conflicting information, text messages, and information, Defendant Ambrose made this accusation from four years prior part of the "Findings of Facts" as true despite no witnesses testifying at any of the multiple hearings about the baseless claim. That is, not one single individual who allegedly made a claim from 2019 came to the hearing or spoke before the hearing panel, yet over and over Defendant Ambrose told the hearing panel to give more credibility and weight to those statements – including the anonymous one – over Plaintiff himself.

58. Defendant Ambrose repeatedly used this incident four years prior as a reason that Plaintiff likely violated Alleged Victim #1's rights.

59. Following three separate days of hearings, the three-person panel found the Plaintiff responsible. Using the other two Title IX allegations against Alleged Victim #2 and #3, the panel expelled Plaintiff from Marshall University.

60. In a strange final day of the hearing, Alleged Victim #1 did not show up to the hearing, but rather gave a long, pre-recorded statement where she lamented that other people

knew about her sexual contact with Plaintiff. On multiple occasions in closing, Defendant Ambrose gave statements attempting to discredit Plaintiff and his witnesses.

61. Plaintiff was innocent of Alleged Victim #1's claims and was wrongfully found to have committed the offense. Plaintiff presented sufficient facts to the panel to raise articulable doubt on the accuracy of the outcome of the disciplinary hearing. Defendant Ambrose's disregard of the two female witnesses, who saw Alleged Victim #1 pursue, kiss, and engage Plaintiff were disregarded. Defendant Ambrose directly told the panel to disregard the two female witnesses as not credible

62. Additionally, Marshall University, the Title IX Director, and Defendant Ambrose had a strong gender bias that motivated the finding. Defendant Ambrose repeatedly tried to discredit any favorable evidence and inform the panel that the favorable evidence should not be given equal weight.

63. As outlined in the Investigator's own closing statement she gave at the end of the production of evidence and testimony, when weighing facts and evidence and finding what she deemed "credible" evidence, in each instance it related back to the claims from other matters that are unreliable, unsubstantiated, and in some cases contrary to the very evidence before the panel. The Investigator indicated that based upon the other claims – most of which were uncorroborated.

64. None of the "character" evidence witnesses showed up to any of the multiple hearings held in December 2023 and into January 2024.

65. The hearing panel still found the witnesses that did not appear more credible than the witnesses that testified based upon Defendant Ambrose's suggestion and claim that they were more credible.

10

66. Plaintiff appealed the finding, but the faculty member that reviewed the appeal upheld the decision.

**Allegation #2**

67. In the separate incident Alleged Victim #2, Reggie Roe alleged that Plaintiff kissed Reggie Roe without his consent while at a gathering at Plaintiff's apartment with several other individuals.

68. Reggie Roe testified at Title IX hearing that shortly after this alleged incident occurred where Roe claims Plaintiff forcibly kissed him, Roe walked over to Plaintiff, kissed him on the mouth, and thanked Plaintiff for inviting him.

69. Defendant Ambrose also found that Plaintiff allegedly created a hostile work environment for storing a painting in an appropriate storage area; Plaintiff presented documentation contradicting such a claim that Defendant Ambrose did not consider nor did Ambrose contact relevant witnesses.

70. Despite this glaring contradiction of a statement and accusation, the Investigator "advised" the panel to find Plaintiff responsible, based upon the other claims – most of which were uncorroborated.

71. Defendant Ambrose repeatedly returned to the allegations of a 2019 non-Marshall student, which she received anonymously and held as a finding of fact that Plaintiff engaged in the behavior.

72. The same panel that heard the allegations of Alleged Victim #1 heard the allegations of Alleged Victim #2 on or about December 18, 2023 and released a decision in January 2024.

73. Plaintiff appealed this case as well on or about February 7, 2024, but the faculty member(s) assigned to hear the appeal in the matter denied the appeal and upheld the finding.

74. Some time at the end of February 2024 or early March 2024, Marshall denied the appeal for Plaintiff.

**Allegation #3**

75. Alleged Victim #3, Jerry Woe, grew up with Plaintiff and knew him since the 9th grade. According to the facts, the two were close friends.

76. Alleged Victim #3 claimed that Plaintiff was stalking and/or following him at Marshall University.

77. Ironically, Plaintiff had not seen Jerry Woe in a couple years and the two did not have classes together. Other than incidentally running into each other on campus, the Plaintiff did not have any type of regular communication or interaction with Jerry Woe.

78. Based upon the false allegations of Jerry Roe, Marshall University placed a "No Contact" Order against Plaintiff.

79. Marshall did not substantiate any allegations of Jerry Woe nor could it as none of the facts – similar to the other two cases – could even corroborate Plaintiff was near Woe intentionally.

80. Plaintiff acknowledged that he *unintentionally* violated the no contact order as he was in the same area as Jerry Woe. Jerry Woe took a photo of Plaintiff and sent it to friends declaring Plaintiff violated the no contact order.

81. Plaintiff never went near Jerry Woe at the time. Plaintiff continued with his interaction with another individual as evident by Jerry Woe's own picture. Yet, Marshall

12

University's Title IX panel found it appropriate to substantiate a claim for violating a No Contact Order even though the panel found no evidence to substantiate that Plaintiff

82. In fact, the overwhelming evidence showed that Plaintiff never stalked or harassed the individual but rather the alleged third victim's claims lacked any and all merit.

83. Yet in its infinite wisdom, the Title IX panel reprimanded Plaintiff for violating the order and included that in its final decision to expel him from Marshall University.

84. The record actually showed that Plaintiff and his family took in Woe while he was in high school based upon personal issues Woe had with his family.

85. Following the investigation against Plaintiff, the investigator Ambrose made findings of fact that Plaintiff committed wrongful conduct and that made findings of fact and conclusions that Plaintiff committed misconduct in 2019.

86. During the Title IX hearings, Plaintiff's representative addressed Ambrose's inappropriate comments and repeated attempts to discredit Plaintiff through an unsubstantiated "anonymous" claim made in 2019 along with other witnesses that did not show up to the hearing. Neither Plaintiff nor his representative were able to cross-examine these character witnesses at the hearing.

87. Following Plaintiff's expulsion from Marshall, he was volunteering at a local high school the following school year. An anonymous caller notified the high school that he had a Title IX hearing, and the high school removed him based upon the 2019 "findings" that Plaintiff allegedly committed misconduct against a high school student – an allegation that is unsubstantiated, untrue, and lacked a single in person witness at the Title IX hearings.

13

88. Ambrose continued to advise the Title IX panel that she believed that Plaintiff was not credible, that his witnesses – eyewitnesses that testified under oath that the Victim #1 told them.

89. Plaintiff and Marshall University had a contractual relationship.

90. The Investigator failed to apply the same scrutiny to the alleged victims as she did to Plaintiff's.

91. If every person was drinking in the room, Ambrose found that Plaintiff was most at fault. Ambrose made every finding negative toward Plaintiff.

92. Plaintiff was informed that the matter would be turned off to law enforcement. To this date – nearly 18 months later – there has been no referral or police investigation (nor should there be as the matter lacked any and all probable cause).

93. In late 2023 and again in 2024, Plaintiff was working in jobs where an "anonymous" individual called his employer claiming he was a convicted rapist. Plaintiff has lost numerous jobs as a result.

94. Plaintiff has been unable to pursue/complete his graduate degree nor has he been able to pursue employment in the field of his studies as a result of the discriminatory and bias investigation and substantiation against him.

## JURISDICTION AND VENUE

95. The Court has federal question jurisdiction under 28 U.S.C. § 1331 because Mr. Doe's claims arise under federal law, namely Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681-88.

14

96. The Court also has supplemental jurisdiction over Mr. Doe's state law claims under 28 U.S.C. § 1367 because those claims are so closely related to his federal law claim as to form the same case or controversy under Article III of the United States Constitution.

97. Venue properly lies in this Court under 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to the claims occurred in this district.

98. Under Title IX, a party may proceed on a civil action related to a college disciplinary matter based upon the erroneous outcome and selective enforcement. Plaintiff asserts jurisdiction on both theories. See *Yusuf v. Vassar College*, 35 F.3d 709 (2nd Cir. 1993). *See Doe v. Coastal Carolina Univ.*, 552 F. Supp. 3d 173 (2023).

## CAUSES OF ACTION

### COUNT I – VIOLATION OF TITLE IX (20 U.S.C. § 1681) – GENDER BIAS AND GENDER DISCRIMINATION

### RETALIATION AGAINST DEFENDANT AMBROSE

99. Plaintiff repeats, realleges, and incorporates the allegations in the paragraphs above as though fully set forth herein.

100. Plaintiff John Doe is a male who was intentionally treated adversely and discriminated against because he was a male accused of sexual misconduct against a female student.

101. While the Fourth Circuit governs reviews of Title IX cases in this jurisdiction – should Respondent file a federal suit – the Fourth Circuit adopted a Second Circuit review as set forth in *Yusuf v. Vassar College*, 35 F.3d 709 (2nd Cir. 1993). *See Doe v. Coastal Carolina Univ.*, 552 F. Supp. 3d 173 (2023).

102. Bias can be shown through evidence such as statements by members of the disciplinary tribunal, statements by pertinent university officials, or patterns of

decision-making that also tend to show the influence of gender. *Doe v. Rollins Coll.*, 2020 U.S. Dist. LEXIS 249437, 2020 WL 8409325, at *9 (citing *Yusuf*, 35 F.3d at 715).

103. Constitutional provisions guarantee that the federal and state governments, respectively, may not deprive any person of life, liberty, or property without due process of law. In the educational context, John Doe's interest is his diploma and in the value of a clear academic record establishes a property right, and his interest in his reputation and good name establishes a liberty right.

104. Title IX prohibits federally supported educational institutions from practicing discrimination on the basis of sex. *See* 20 U.S.C. § 1681(a) ("No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance. . . .").

105. Marshall receives federal financial assistance.

106. Title IX is enforceable through an implied private right of action. *See Cannon Univ. of Chicago*, 441 U.S. 677, 703 (1979).

107. In multiple instances, Marshall selectively enforced Title IX against Plaintiff based on his sex by intentionally disregarding its own rules (the Policy for Title IX proceedings) to Plaintiff's detriment, including, but not limited to as follows:

   a. Allowing the Investigator to abandon the "neutral, fact-finding process" and to usurp the role of the Hearing Panel by resolving disputed facts;

   b. Undermining the presumption of non-responsibility by presenting the Hearing Panel with an Investigation Report concluding that the Plaintiff was responsible for misconduct before the Hearing Panel had received any evidence;

   c. Ruling that the Hearing Panel can consider testimony not subject to cross examination;

d.  Allowing the Investigator to discredit factual witnesses who provided exculpatory evidence that would have provided a different outcome in the matter;

e.  Ignoring the testimony of eye witnesses to the alleged misconduct solely because while deeming the testimony of individuals who did not testify before the panel and those witnesses had no personal knowledge to the accusations;

f.  Relying on evidence of "prior conduct" to establish that the Plaintiff acted in accordance therewith especially when those witnesses did not testify during a Title IX hearing;

g.  Relying on personal opinions and statements about which witnesses had no personal knowledge;

h.   Relying on highly prejudicial instances of alleged misconduct totally unrelated to the allegations in the complaint;

i.  Failing to consider relevant evidence provided by Plaintiff;

j.  Failing to draw any adverse inference from the Complainant's destruction of relevant electronic evidence;

k.  Denying the Plaintiff his right to pose questions to witnesses and suggest additional avenues for investigation;

l.  Improperly penalizing the Plaintiff and his witnesses for exercising their rights not to participate in certain aspects of the investigation;

m.  For improperly sitting the same panel for all three hearings against Plaintiff;

n.  Failing to complete its investigation with a "reasonably prompt" timeframe;

o.  For openly advocating that Plaintiff was not credible and minimizing any and all wrongful or dishonest conduct on the part of the alleged victims or adverse witnesses.

108.  Although the Policy allows the investigator some discretion to determine the relevance of any proffered evidence, it specifically provides that the investigator generally should not consider "personal opinions," evidence not based on "direct observations or reasonable inferences," or "statements as to any party's general reputation for any character trait."

17

109. Yet that is exactly what Ambrose did.

110. The alleged victim, Jane Roe, testified that she might have given consent to Plaintiff.

111. Two female witnesses testified under oath that Jane Roe expressly told them each that she liked Plaintiff and that she was going to "f*ck him."

112. Investigator Ambrose repeatedly asked the panel not to consider this evidence and to consider the unlawful character evidence from witnesses that did not appear in person.

### COUNT II – VIOLATION OF TITLE IX (20 U.S.C. § 1681) –

### SELECTIVE ENFORCMENT AND ERRONEOUS OUTCOME
### AGAINST MARSHALL UNIVERSITY AND DEFENDANT AMBROSE

113. Plaintiff repeats, realleges, and incorporates the allegations in the paragraphs above as though fully set forth herein.

114. Constitutional provisions guarantee that the federal and state governments, respectively, may not deprive any person of life, liberty, or property without due process of law. In the educational context, John Doe's interest is his diploma and in the value of a clear academic record establishes a property right, and his interest in his reputation and good name establishes a liberty right.

115. Title IX prohibits federally supported educational institutions from practicing discrimination on the basis of sex. *See* 20 U.S.C. § 1681(a) ("No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance. . . .").

116. Marshall receives federal financial assistance.

18

117.   Title IX is enforceable through an implied private right of action. *See Cannon v.Univ. of Chicago*, 441 U.S. 677, 703 (1979).

118.   The University receives federal funding, including in the form of federal student loans given to students, and therefore is subject to the requirements of Title IX.  Title IX  prohibits gender discrimination in the educational setting.

119.   Unlawful discrimination exists when gender bias is a motivating factor in a student's discipline, which in turn occurs when gender bias motivates an outcome or sanction atleast in part.

120.   Bias can be shown through evidence such as statements by members of the disciplinary tribunal, statements by pertinent university officials, or patterns of decision-making that also tend to show the influence of gender." Doe v. Rollins Coll., 2020 U.S. Dist. LEXIS 249437, 2020 WL 8409325, at *9 (citing Yusuf, 35 F.3d at 715).

121.   The finding and sanction against John Doe were the product of gender bias at least in part, as exhibited by all of the following things, among others:

a.   Extreme pressure upon Marshall University by the federal government, national and local news, and local outrage to give deferential treatment to claims of assault brought by women against men, exhibited both by nationwide enforcement and local results at the University;

b.   Extreme pressure from Marshall's student body and alumni to enforce a gendered view of claims of violence brought by women against men.

122.   The statements and actions of a biased investigator and hearing panel which, among other things:

a.   Repeatedly questioned Plaintiff much more pointedly and confrontationally than they did the alleged victims, despite the glaring contradictions and inconsistencies they told;

b. Found that alleged victims had told "consistent" stories despite the many changes to their stories, including on the most central parts of their allegations;'

c. Refused to pursue exculpatory witnesses, even when Plaintiff requested it and witnesses came forward;

d. A conclusory and unsupported rationale that calls the decision against John Doe into grave doubt, and failed to address significant exculpatory evidence. as explained above.

e. A permanent, disclosable sanction that will gravely impact John's future and which is disproportionate to the violation he was (wrongly) found to have committed.

123.    As a direct result of the University's violation of Title IX, and as a direct and proximate cause thereof, Mr. Doe has been seriously and irreparably damaged in the following ways, among others: he has been falsely branded an assaulter of women, which he will have to report to many future schools and future employers; endured emotional and psychological suffering as a result of the University's one-sided treatment of the false charges against him; and will suffer a permanent reduction in lifetime earnings.

124.    Accordingly, Marshall is liable to Mr. Doe for violations of Title IX and for all damages arising out of that violation.

125.    In multiple instances, Marshall selectively enforced Title IX against Plaintiff based on his sex by intentionally disregarding its own rules (the Policy for Title IX proceedings) to Plaintiff's detriment, including, but not limited to as follows:

a. Allowing the Investigator to abandon the "neutral, fact-finding process" and to usurp the role of the Hearing Panel by resolving disputed facts;

b. Undermining the presumption of non-responsibility by presenting the Hearing Panel with an Investigation Report concluding that the Plaintiff was responsible for misconduct before the Hearing Panel had received any evidence;

c. Ruling that the Hearing Panel can consider testimony not subject to cross

20

examination;

d. Ignoring the testimony of the lone non-party eye-witness to the alleged misconduct solely because she was in a romantic relationship with the Plaintiff, while deeming the testimony of Jane Roe's boyfriend to be credible;

e. Relying on evidence of "prior conduct" to establish that the Plaintiff acted in accordance therewith;

f. Relying on personal opinions and statements about which witnesses had no personal knowledge;

g. Relying on highly prejudicial instances of alleged misconduct totally unrelated to the allegations in the complaint;

h. Failing to consider relevant evidence provided by the plaintiff;

i. Failing to draw any adverse inference from the Complainant's destruction of relevant electronic evidence;

j. Denying the Plaintiff his right to pose questions to witnesses and suggest additional avenues for investigation;

k. Improperly penalizing the Plaintiff and his witnesses for exercising their rights not to participate in certain aspects of the investigation;

l. Recommending a finding of "no responsibility" in the Plaintiff's cross-complaint alleging retaliation by Roe, despite Roe's admission that her knowledge of the

m. Failing to complete its investigation with a "reasonably prompt" timeframe;

126. Plaintiff approached the Title IX director, concerned about messages he received and improper rumors about him.

127. Marshall University Title IX director told the panel that she believed that his concern was disingenuous but rather snooping around to see if anyone had filed complaints about him.

128. All parties involved in the investigation or review ignored crucial statements against interest by multiple alleged victims and disregarded the admittance that the three colluded to file complaints together.

129. The alleged victim, Jane Roe, testified that she might have given consent to Plaintiff; and

130. Two female witnesses testified under oath that Jane Roe expressly told them each that she liked Plaintiff and that she was going to "f*ck him."

**COUNT III – VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. § 1983**

**VIOLATION OF THE FIRST AND FOURTEENTH AMENDMENT (42 U.S.C. § 1983) - EQUAL PROTECTION AND VIOLATION OF DUE PROCESS AGAINST DEFENDANTS MARSHALL AND AMBROSE**

131. Plaintiff repeats, realleges, and incorporates the allegations in the paragraphs above as though fully set forth herein.

132. Under the Fourteenth Amendment, Plaintiff had the right as a public-school student to personal security and bodily integrity and equal protection of the laws.

133. Defendant Ambrose has been and remains a state actor acting under color of state law when she violated Plaintiff's clearly established rights under the Fourteenth Amendment.

134. Defendant Ambrose subjected Plaintiff to violations of his clearly established right to the equal protection of laws by punishing him and threatening to further punish him using Marshall's Title IX disciplinary process based on his sex for the reasons stated above, where Jane Roe has been treated markedly differently.

135. "In addition to [her] own alleged actions in putting the Plaintiff at a disadvantage in the complaint process compared to [his accuser], Defendant may be subject to

22

supervisory liability" under the Equal Protection Clause. *Rex v. W. Va. Sch. of Osteopathic Med.*, 119 F. Supp. 3d 542, 554 (S.D. W. Va. 2015).

136. Defendant Ambrose failed conduct a thorough and impartial investigation of the allegations against Plaintiff.

137. The aforementioned practice fails to comply with state and federal regulations and results in an institutional policy and/or custom that deprives citizens, including Plaintiff's, of his constitutional rights under the First and Fourteenth Amendments and/or is in deliberate disregard of Plaintiff's aforementioned constitutional safeguards.

138. The Defendants', acting under color of law, perpetuated a custom and/or practice of operation that deprived John Doe, a citizen of the United States, of their constitutional rights to be free from violation of his privacy and security and equal protection under the law.

139. As a result of the Defendants' customs and/or practices, and/or deliberate indifference to Plaintiffs' rights, Plaintiff has suffered violations of his First and Fourteenth Amendment rights, for which he seeks damages as requested in the prayer for relief.

## COUNT IV VIOLATION OF THE FOURTEENTH AMENDMENT (42 U.S.C. § 1983) PROCEDURAL DUE PROCESS AGAINST DEFENDANT AMBROSE

140. Plaintiff repeats, realleges, and incorporates the allegations in the paragraphs above as though fully set forth herein.

141. The Fourteenth Amendment guarantees procedural due process. U.S. Const. Amend. XIV.

142. To make a procedural due process claim, a plaintiff must allege "that he had a constitutionally cognizable life, liberty, or property interest"; (2) "that the deprivation

of that interest was caused by some form of state action"; and (3) "that the procedures employed were constitutionally inadequate." *Sansotta v. Town of Nags Head*, 724 F.3d 533, 540 (4th Cir. 2013) (clean up)

143. Plaintiff possesses a "property" interest in the continuation and completion of his graduate education at Marshall. *Board of Curators of Univ. of Missouri v. Horowitz*, 435 U.S. 78, 82 (1978).

144. "To have a property interest subject to procedural due process protection, an individual must be entitled to a benefit created and defined by a source independent of the Constitution, such as state law." *Huang v. Bd. of Governors of Univ. of N.C.*, 902 F.2d 1134, 1141 (4th Cir. 1990) (citing *Board of Regents v. Roth*, 408 U.S. 564, 577 (1972).

145. "Almost forty years ago, the Supreme Court of Appeals of West Virginia recognized that a student has 'a sufficient property interest in the continuation and completion of his medical education to warrant the imposition of minimal procedural due process protections.'" *Al-Asbahi v. W. Virginia Univ. Bd. of Governors*, No. 1:15CV144, 2017 WL 402983, at *11 (N.D. W. Va. Jan. 30, 2017) (quoting *Evans v. W. Va. Bd. of Regents*, 271 S.E.2d 778, 780 (W. Va. 1980)); *see also North v. W. Va. Bd. of Regents*, 233 S.E.2d 411 (W. Va. 1977).

146. Second, Defendant Ambrose's threatened and certainly impending deprivation of that interest via her critical role in Marshall's Title IX badly flawed disciplinary process is caused by state action.

147. Third, the procedures employed by Defendant Ambrose and otherwise at her direction were, and remain, constitutionally inadequate.

148. Defendant Ambrose violated Plaintiff's procedural due process rights by denying him fair and impartial investigators and adjudicators and by restricting his ability to present a full and fair defense against Jane Roe's complaint, among many other acts and omissions describe above.

149. Plaintiff was denied due process because, among other things, the complaint against him has not been adjudicated in a timely manner; the rules applicable to the proceeding against him were not followed; Plaintiff was restricted on the questions he could and for having Defendant Ambrose advise the panel to give more weight to witnesses who did not testify and subject themselves to cross examination than to Plaintiff and his supporting witnesses; having the Title IX investigator Defendant Ambrose repeatedly giving the appearance of support *for Jane Roe and other alleged victims*, including by refusing to continue the date of the review hearing despite the presence of good cause (the manner and timing of the hearing panel); and otherwise being thwarted from presenting a meaningful defense in the proceedings overall.

150. Due to Ambrose's wrongful acts, Plaintiff has suffered and continues to suffer losses of educational opportunities and benefits, along with injuries, damages and losses, including, but not limited to, lost future earnings and loss of earning capacity, damage to and delays in his pursuit of higher education.

151. Due to Defendant Ambrose's wrongful acts, Plaintiff has suffered fear, anxiety, humiliation, and reputational harm.

152. Due to Defendant Ambrose's wrongful acts, Plaintiff has socially withdrawn from his classmates and friends.

153. Due to Defendant Ambrose's wrongful acts, Plaintiff was expelled from Marshall

University and has repeated job opportunities blocked.

154.    Indeed, as a result of Defendant Ambrose's wrongful acts, Plaintiff's education has been placed on hold. His ability to make a decent living has been substantially reduced.

155.    Due to Defendant Ambrose's wrongful acts, Plaintiff has incurred substantial attorneys' fees to protect himself, his rights, and his future.'

## COUNT V: ABUSE OF PROCESS

156.    Plaintiff incorporates the preceding paragraphs as if set forth herein.

157.    The named Defendants wrongfully and unlawfully caused or instituted legal process against your Plaintiff by falsely accusing him of violating its policies against harassment.

158.    Defendants violated the very provisions meant to protect Marshall University Students by weaponizing it against males accused of sexual misconduct – not affording them a fair hearing to avoid the public outrage that was present in 2022 and 2023.

159.    Defendants, by their actions as alleged above, sought to damage and harm the Plaintiff's person, property, character, and/or reputation and, in so doing, deprive him of liberty and property.

160.    Defendants' actions against Plaintiff constitute willful and/or malicious misuse and/or misapplication of the law and/or legal process because Defendant sought to accomplish the improper purpose of using the legal process to harm and embarrass Plaintiff and damage his reputation in the community.

161.    As a direct and proximate result of Defendants' actions, Plaintiff has suffered

26

damages including, but not limited to, damage to his reputation, and severe emotional distress.

162.    Defendants acted with the intent to deprive and/or with reckless disregard for the Plaintiff's constitutional rights as provided by the laws and policies of the United States and the State of West Virginia.

163.    Defendant took actions against Plaintiff with the deliberate intent to intimidate, embarrass, and injure him. As such, Defendant's conduct supports recovery of *punitive damages against him in an amount sufficient to deter such conduct in the future, and Plaintiffs seek relief as requested below*.

## COUNT VI: AIDING AND ABETTING – VIOLATION OF THE WEST VIRGINIA HUMAN RIGHTS ACT

164.    Plaintiff repeats, realleges, and incorporates the allegations in the paragraphs above as though fully set forth herein.

165.    The above-describe acts of Defendant Ambrose constitute aiding and abetting unlawful discriminatory practices. The WVHRA "provides for a cause of action against individuals who aid or abet an unlawful discriminatory act." *Larry v. Marion Cnty. Coal Co.*, 302 F. Supp. 3d 763, 776 (N.D. W. Va. 2018).

166.    In the context of the WVHRA, an individual may be found to be liable for aiding and abetting a discriminatory practice if that individual knows the act breaches a duty and the individual "gives substantial assistance or encouragement to" the discriminatory conduct of another. *Klug v. Marshall Univ. Joan C. Edwards Sch. of Med.*, No. CV 3:18-0711, 2019 WL 1386403, at *7 (S.D. W. Va. Mar. 27, 2019).

167.    Here, the above facts demonstrate that Defendant Ambrose, in her critical role as Title IX Investigator, provided substantial assistance and encouragement to the

27

discriminatory conduct of Marshall in depriving Plaintiff of his legal rights on the basis of sex.

168. Due to Ambrose's wrongful acts, Plaintiff suffered losses of educational opportunities and benefits, along with injuries, damages and losses, including, but not limited to, lost future earnings and loss of earning capacity, damage to and delays in his pursuit of higher education, and fear, anxiety, humiliation, and emotional distress.

## COUNT VII– BREACH OF CONTRACT

169. Plaintiff repeats, realleges, and incorporates the allegations in the paragraphs above as though fully set forth herein.

170. At all times relevant hereto, a contractual relationship existed between the University and Mr. Doe. The University's Code was a part of that contract. Under the contract, the University was required to act in accordance with these publications in resolving complaints of misconduct, in the investigation of those complaints, in the process of adjudicating those complaints, in the process of sanctioning students, and in resolving appeals.

171. The University breached this contract with Mr. Doe, and the covenant of good faith inherent in it, by failing to comply with the Policy in at least the following ways:

172. The Code promises that the University will not find a student responsible for misconduct unless adequate evidence and the standard of proof is met and that Plaintiff be afforded an equal opportunity and just defense.

173.    Marshall violated its own Code when it used the same panel in all three cases against Plaintiff and the Investigator repeatedly excused or minimized the accusers faults and untruths and attempted to suggest Plaintiff had no credibility to the panel.

174.    The finding against Plaintiff and its rationale were arbitrary and capricious, without reasoned basis, ignored contrary evidence, and were the products of pre-determined bias in favor the Complainant.

175.    The Title IX office did not disclose relevant information that Alleged Victim #1 disclosed after Plaintiff provided an informal resolution as called upon in the Marshall University policies and procedure. Marshall was selective in its disclosures.

176.    In all of those ways, and the ways described in more detail above, Marshall failed to apply the "clear and persuasive" or applicable evidence standard showed for the hearing and therefore could not be challenged on the many ways her story changed or the direct contradictory evidence that multiple colluding accusers presented.

## COUNT VII: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS AGAINST DEFENDANT AMBROSE

177.    Plaintiff repeats, realleges, and incorporates the allegations in the paragraphs above as though fully set forth herein.

178.    To state a claim for intentional infliction of emotional distress under West Virginia law, "a plaintiff must allege '(1) conduct by the defendant which is atrocious, utterly intolerable in a civilized community, and so extreme and outrageous as to exceed all possible bounds of decency; (2) the defendant acted with intent to inflict emotional distress or acted recklessly when it was certain or substantially certain such distress would result from his conduct; (3) the actions of the defendant caused the plaintiff to suffer emotional distress; and (4) the emotional distress suffered by the plaintiff was so

29

severe that no reasonable person could be expected to endure it.'" *Davis v. Milton Police Dep't*, No. CV 3:20-0036, 2020 WL 2341238, at (S.D. W. Va. May 11, 2020) (quoting *Travis v. Alcon Labs., Inc.*, 504 S.E.2d 419, 425 (W.Va. 1998)).

179. Defendant Ambrose's conduct was "fraudulent, malicious, or otherwise oppressive." *W. Va. Reg'l Jail & Corr. Facility Auth. v. A.B.*, 766 S.E.2d 751, 762 (W. Va. 2014). "Whether conduct may reasonably be considered outrageous is a legal question, and whether conduct is in fact outrageous is a question for jury determination." *Davis*, 2020 WL 2341238, at *9 (quoting Syl. Pt. 7, *Love v. Georgia-Pac. Corp.*, 550 S.E.2d 51, 53 (W. Va. 2001)).

180. Defendant Ambrose's conduct towards Plaintiff may reasonably be considered outrageous.

181. As set forth in detail above, Defendant Ambrose has repeatedly and with impunity demonstrated a bias against Plaintiff in connection with her role as Title IX Investigator for Marshall University by skewing the evidence and presentation of the case against him and refused to permit Plaintiff a full and fair opportunity to present a defense when she repeatedly discredited Plaintiff and his supporting witnesses while at the same time repeatedly giving credence to witnesses who were not subjected to cross-examination and otherwise failed to ensure a full and fair disciplinary process

182. Due to Defendant Ambrose's outrageous acts, Plaintiff has suffered and continues to suffer from extreme emotional distress.

183. Due to Defendant Ambrose's outrageous acts, Plaintiff has suffered fear, anxiety, humiliation, and reputational harm.

184.  Due to Defendant Ambrose's outrageous acts, Plaintiff has socially withdrawn from his classmates and friends.

185.  Due to Defendant Ambrose's outrageous acts, Plaintiff was forced to medically withdraw from school and seek psychiatric treatment.

186.  Due to Defendant Ambrose's outrageous acts, Plaintiff has also suffered losses of educational opportunities and benefits, damage to and delays in his pursuit of higher education.

187.  Indeed, as a result of Defendant Ambrose's outrageous acts, Plaintiff's education has been placed on hold and Plaintiff has lost multiple employment opportunities.

188.  Due to Defendant Ambrose's wrongful acts, Plaintiff has incurred substantial attorneys' fees.

**WHEREFORE**, Plaintiff respectfully requests the following relief:

1. Trial by jury;

2. Judgment against Defendant Marshall, and Defendant Ambrose in her individual capacity, for compensatory and consequential damages in an amount to be determined at trial, plus expenses and court costs;

3. Declaratory and injunctive relief against Marshall and Defendant Ambrose in her official capacity;

4. Any legally applicable compensatory or general damages against Marshall and Ambrose.

5. Punitive damages;

6. Pre-judgment and post-judgment interest at the maximum allowable rates at law;

7. Reasonable attorney's fees and costs;

8. Any applicable nominal damages;

9. Any other relief to which Plaintiff may seek or be entitled to under law or equity.

Respectfully submitted,

PLAINTIFF, JOHN DOE,

s/ Abraham J. Saad
Abraham J. Saad WVSB #10134
Hoyt Glazer WVSB #6479
Glazer Saad Anderson L.C.
320 9th Street, Suite B
P.O. Box 1638
Huntington, WV 25717-1638
Telephone: 304-522-4149
Facsimile: 800-879-7248
Email: abe@gsalaw-wv.com

32